UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA     CRIMINAL NO. 09-cr-00115(3)

VERSUS     JUDGE HICKS

THAOPHILIUS C. GOINS     MAGISTRATE JUDGE HORNSBY

### REPORT AND RECOMMENDATION

**Introduction**

Before the court is a Motion to Suppress (Doc. 63) filed by Defendant, Thaophilius Goins. Defendant seeks to suppress information obtained by narcotics agents from two cell phones found inside Defendant's pick-up truck. Defendant consented to the search of his phones, but he argues that his consent was invalid because it was granted pursuant to a unconstitutionally prolonged traffic stop. For the reasons that follow, it is recommended that Defendant's motion be denied.

**Facts**

In lieu of an evidentiary hearing, the parties agreed to submit Defendant's motion for decision by the court on a written stipulation (Joint Ex. 1) and a DVD recording (Joint Ex. 2) of the traffic stop at issue. See Docs. 69 and 82.

The evidence shows that Trooper Curtis Bennett of the Texas Department of Public Safety received information from DEA Task Force Agent Hank Haynes of Shreveport, at approximately midnight on April 30, 2009, to be on the lookout for a black Ford pick-up

truck bearing Texas license number 58CLD6. Haynes told Bennett that the truck had departed Jasper, Texas on Highway 190 that evening, and that the truck had been involved in a drug transaction. Bennett asked Haynes to stop the truck, identify the occupants, and search for any cash that may have been involved in the drug transaction.

A short time later, Trooper Bennett and his partner, Trooper Neel, spotted the described vehicle. As they followed the truck, they observed the driver weave across the center and right fog lines on the road.

The DVD shows that Trooper Bennett initiated a traffic stop at approximately 00:05 a.m. (As Bennett made the stop, he articulated – presumably for the benefit of the recording – the traffic violations he observed.) Defendant exited his truck and approached Trooper Bennett. When asked, "Any reason why you're not driving a little better?," Defendant stated that he was talking on the phone.

Trooper Bennett asked Defendant about his itinerary and his passenger. Defendant said they were coming from Leesville Lumber in Leesville, Louisiana, where they went to try to repair one of Defendant's logging (or lumber) trucks. Video 00:06. Defendant identified the passenger as Dale [Dale Robert House, a co-defendant in this case]. Video 00:07:28.

Trooper Bennett approached (and knocked on) the passenger door. The passenger opened the door. Video 00:10:27. The passenger, who was clearly ill at the time of the stop, stated that he and Defendant were coming from Woodville, where they tended to a truck.

When Bennett asked, "Where's that?" the passenger stated, "I don't even know, I'm just riding with him." The passenger stated that he was suffering from food poisoning. The passenger produced an expired driver's license to Trooper Bennett. Video 00:12:15.

While talking to the passenger, Trooper Bennett smelled the odor of burnt marijuana, and Bennett saw what he thought were seeds between the passenger's legs. Video 00:12:41. Bennett asked the passenger how long ago the marijuana had been smoked, and the passenger responded earlier that day. The passenger denied that any more marijuana was in the truck. The passenger exited the vehicle and Trooper Bennett conducted a pat down. Video 00:13:25.

Trooper Bennett approached Defendant and asked him when the marijuana had been smoked in the truck. Video 00:14:18. Defendant stated that it was earlier that evening when they left Houston. Bennett asked Defendant if any more marijuana was in the truck. Defendant replied that there was not. Defendant volunteered, "You can look in there." Trooper Bennett responded: "Do you care if I check the contents of the vehicle?" Video 00:14:33. Defendant responded: "No, not a problem." "Go right ahead."

Trooper Bennett then conducted a search of the cab and bed areas of the truck. While conducting the search, he stated (presumably for the benefit of the recording device) that Defendant and the passenger had conflicting stories about when they left Houston. He also noted the smell of "burnt weed" in the truck. Trooper Bennett also observed that the passenger was nervous ("he is already puking on the side of the road"). Video 00:15:37.

Trooper Bennett searched the truck, but he found no drugs or other contraband. However, he did locate two cell phones. During the search, Bennett brought a water bottle to the sick passenger. Video 00:20:18.

Trooper Bennett returned to his patrol car and called the Task Force agents. Video 00:28:20. He told the agents that the "truck is clean." (This is about 23-24 minutes into the stop.) But he also informed the agents of the smell of burnt marijuana. He asked the agents whether they should "run the dog." Trooper Bennett stated that he can get a canine to the scene in the next 15 to 20 minutes. However, he also stated that the dog would likely hit on the truck due to the smell of marijuana. The canine was requested. Video 00:33:23.

Trooper Bennett again approached Defendant and notified Defendant that a canine had been requested. Defendant told Trooper Bennett that is "not a problem," and "you can tear that motherfucker up." Video 00:34:05. They discussed Defendant's trucking business, including how Defendant used a website [www.getloaded.com] to keep his trucks busy. Trooper Bennett told Defendant that he was going to "check [his] license right quick," and Bennett returned to his patrol car.

The canine arrived on the scene. Before the dog was given access to the truck, Bennett opened the passenger door and removed an item (which Defendant identified as sweet potato pie) from the truck. Video 00:42:29. The dog's handler then moved the dog around (and inside the cab of) the truck. Video 00:43:08. The video does not reflect that the dog alerted on the truck. Bennett then asked the canine handler to go behind him and look

in the truck. Video 00:46. The officers also looked under the hood of the truck. Video 00:48. Trooper Bennett then returned to his patrol car and had another telephone conversation with the agents. The audio recording picks up one of the men saying that he is "pretty sure there's money in there." Video 00:54:35.

DEA Agents Page Devall and Billy Permenter arrived on the scene about 53 minutes into the traffic stop. Video 00:58:47. Agent Devall had received information from Agent Haynes about the drug transaction in Jasper, Texas. Devall and Permenter looked in the cab of the truck. The agents and troopers discussed the existence of "tool marks" on the front seat. One of the agents asked: "Did they have any phones?" Video 01:01:03.

Agent Devall retrieved the two cell phones that were located in the truck and approached Defendant. Agent Devall asked Defendant if the phones belonged to him. Defendant responded that they did. Agent Devall then asked Defendant if he minded if Agent Devall looked at the phones. When Agent Devall asked Defendant if Defendant was granting consent to look at the phones, Defendant calmly responded: "Go ahead. You can look all you want to." Video 01:06:48 (Defendant's consent to the search of his cell phones occurred approximately one hour after the traffic stop began.). Agent Devall examined the phones for contact numbers and recorded certain numbers that allegedly connected Defendant with the Jasper, Texas drug transaction.

Shortly thereafter, the agents received a phone call, and someone said, "They got the money." Video 01:09:49. [This indicates that the drug proceeds were discovered inside

another vehicle that was at the scene of the Jasper, Texas transaction and that was stopped and searched elsewhere.] Bennett then asked the agents if they were going to arrest Defendant and the passenger, stating, "I don't have anything." The agents told Bennett to "cut them loose with a couple of warnings."

One of the officers placed or received another phone call. According to that call, someone named DeRusso [phonetic] told the officers to let them go. Video 01:16:50. Another officer said, "Write him a ticket for failure to do something." Video 01:21. The recording then picked up the sound of a printer (presumably located inside Trooper Bennett's patrol car). Video 01:23:53. After a quick glance inside the truck by another officer or agent, Trooper Bennett gave the warnings to Defendant, thanked him for his cooperation, and told Defendant that he was free to go. Video 01:27. Defendant and the passenger returned to Defendant's truck and left the scene. Video 01:28:08.

Defendant, the passenger, and two other men were later indicted for conspiracy and possession with intent to distribute powder cocaine. According to the Government's brief, the information found in Defendant's phones linked Defendant to his co-defendants in this case.

**Defendant's Arguments**

Defendant argues that the information obtained from the search of the cell phones should be suppressed because Defendant's consent to the search of the cell phones was obtained pursuant to an illegal detention. Specifically, Defendant argues that the continued

detention of Defendant after the search of the truck revealed nothing, and after the canine failed to alert on the truck, impermissibly exceeded the scope of the initial traffic stop.

**Law Regarding Traffic Stops**

The legality of a traffic stop is analyzed under the framework articulated in Terry v. Ohio, 392 U.S. 1 (1968). See Knowles v. Iowa, 525 U.S. 113, 117 (1998); Berkemer v. McCarty, 468 U.S. 420, 439 (1984); United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004)(en banc). Under the two-part Terry reasonable suspicion inquiry, the court must determine whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20; Brigham, supra at 506-507; U.S. v. Lopez-Moreno, 420 F.3d 420, 429-434 (5th Cir. 2005).

**The Initial Stop**

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. See United States v. Breeland, 53 F.3d 100, 102 (5th Cir.1995). In making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Cortez, 449 U.S. 411, 417 (1981). Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken

together with rational inferences from those facts, reasonably warrant the search and seizure. See, e.g., United States v. Santiago, 310 F.3d 336, 340 (5th Cir.2002). In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. Arvizu, 534 U.S. at 274. However, it is clear that the officer's mere hunch will not suffice. Terry, 392 U.S. at 27. It is also clear that reasonable suspicion need not rise to the level of probable cause. Arvizu, 534 U.S. at 274.

An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses. United States v. Lenz, 162 Fed. Appx. 379, 382 (5th Cir. 2006). Thus, an officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment. Scott v. United States, 436 U.S. 128, 138 (1978); Devenpeck v. Alford, 543 U.S. 146, 153 (2004). See also Goodwin v. Johnson, 132 F.3d 162, 173 (5th Cir. 1997) ("So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment ....").

Defendant does not dispute that the traffic stop was justified at its inception. While the video does not show the traffic violations (weaving), the parties stipulated (Joint Ex. 1) that the troopers observed Defendant commit traffic violations. And when Trooper Bennett asked Defendant why he was not driving better, Defendant implicitly admitted to poor driving by explaining that it was because he was talking on the phone. Furthermore, and as

explained in more detail below, under the collective knowledge doctrine, Trooper Bennett had reasonable suspicion to believe that the truck contained evidence, including drug proceeds, from the Jasper, Texas transaction. Accordingly, the traffic stop was justified at its inception.

**Continued Detention**

As for the second prong of the Terry inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." Brigham, 382 F.3d at 507. In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. Id. at 507-08. An officer may also ask the driver about the purpose and itinerary of his trip. Id. at 508. Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which Terry's second prong is aimed." Id.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention. Brigham, 382 F.3d at 510. See also Santiago, 310 F.3d 336, 341-42 (5th Cir. 2002); United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 200 (5th Cir.1999), *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000).

A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. See Brigham, 382 F.3d at 507; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003); U.S. v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006). However, mere "uneasy feelings" and inconsistent stories between a driver and passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking. U.S. v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006).

Defendant argues that Trooper Bennett unconstitutionally prolonged the traffic stop that resulted in Defendant's consent to search the cell phones. Defendant argues that, once Trooper Bennett found nothing in the truck and after the canine failed to alert on the truck, Defendant's continued detention (his consent to search his cell phones was obtained approximately one hour after the traffic stop began) was unlawful and his subsequent consent to the search of the cell phones was invalid.

Defendant's argument might be persuasive if the sole basis for the traffic stop were the traffic violations observed by Trooper Bennett. But that is not the case. Under the collective knowledge doctrine, Trooper Bennett had reasonable suspicion to believe that Defendant had participated in a drug transaction in Jasper, Texas and that Defendant's truck would contain drug proceeds or other evidence related to that drug transaction.

The Fifth Circuit has applied the collective knowledge doctrine in two distinct types of cases: (1) those where the arresting officer has no personal knowledge of any of the facts establishing probable cause, but simply carries out directions to arrest given by another officer who does have probable cause, e.g., United States v. Impson, 482 F.2d 197 (5th Cir. 1973); United States v. Allison, 616 F.2d 779 (5th Cir.1980); and (2) those where the arresting officer has personal knowledge of facts which standing alone do not establish probable cause but, when added to information known by other officers involved in the investigation, tips the balance in favor of the arrest, e.g., United States v. Nieto, 510 F.2d 1118, 1120 (5th Cir. 1975); United States v. Agostino, 608 F.2d 1035, 1037 (5th Cir.1979).

In the former cases, the officer who issues the directive must himself have probable cause to arrest. Weeks v. Estelle, 509 F.2d 760, 765 (5th Cir. 1975); United States v. Simpson, 484 F.2d 467, 468 (5th Cir.1973). In the latter cases, the "laminated total" of the information known by officers who are in communication with one another must amount to probable cause to arrest. United States v. Edwards, 577 F.2d 883, 895 (5th Cir. 1978) (en banc); Agostino, 608 F.2d at 1037; United States v. Webster, 750 F.2d 307, 323 (5th Cir. 1984). Thus, the arresting officer need not have personal knowledge, if being directed by another who does. See, e.g., United States v. Ibarra, 493 F.3d 526, 530 (5th Cir. 2007)(probable cause existed under collective knowledge doctrine where arresting officer did not know all of the facts; arresting officer was told to be on the look-out for a certain vehicle and to make a traffic stop if the driver violated any traffic laws).

The collective knowledge doctrine is not limited to probable cause for arrests; it has also been applied in the context of reasonable suspicion for a traffic stop. See, e.g. United States v. Carmenate, 2009 WL 2998568 (5th Cir. 2009) (collective knowledge supported reasonable suspicion for traffic stop); United States v. Cortez, 2008 WL 5068619 (5th Cir. 2008)(collective knowledge of officers provided reasonable suspicion and justified continued detention while the officers waited for canine to arrive); United States v. Sanchez, 199 F.3d 753, 759 (5th Cir. 1999).

Agent Hank Haynes, as well as other officers, had observed Defendant's truck during the Jasper, Texas drug transaction. Agent Haynes and those other officers, therefore, had reasonable suspicion to believe that the truck would contain evidence of that transaction. The collective knowledge of Agent Haynes and the other officers afforded Trooper Bennett with reasonable suspicion that Defendant's truck contained evidence pertaining to the drug transaction.

Trooper Bennett's reasonable suspicion quickly rose to the level of probable cause when Trooper Bennett approached the passenger's side of the truck to talk to the passenger and smelled the odor of burnt marijuana. Additionally, both Defendant and the passenger readily admitted to smoking marijuana in the truck a few hours earlier. The Fifth Circuit has repeatedly held that the smell of the marijuana gives rise to probable cause to search a vehicle for drugs. See, e.g., United States v. McSween, 53 F.3d 684, 686-687 (5th Cir. 1995)(the smell of marijuana alone may be enough for a finding of probable cause); United States v.

Reed, 882 F.2d 147, 149 (5th Cir.1989) (the officer's detection of the odor of burnt marijuana "in itself ... justified the subsequent search of [the defendant's] vehicle"); United States v. Henke, 775 F.2d 641, 645 (5th Cir.1985) ("Once the officer smelled the marijuana, he had probable cause to search the vehicle."); United States v. Gordon, 722 F.2d 112, 114 (5th Cir.1983) (same); United States v. McLaughlin, 578 F.2d 1180, 1183 (5th Cir.1978) (same); and United States v. Sanchez, 199 F.3d 753, 760 (5th Cir. 1999)(same).

Defendant and his passenger both readily admitted to smoking marijuana in the truck earlier that evening. Their admission, along with the smell of marijuana, tool marks on the seat of the truck, and the collective knowledge of the officers about the drug transaction in Jasper, provided not just reasonable suspicion to detain but probable cause to search the truck for illegal narcotics, drug proceeds, or other contraband. Defendant's continued detention throughout the search was justified under the unique circumstances of this case. See United States v. Lork, 132 Fed. Appx. 34 (5th Cir. 2005)(detectable odor of marijuana emanating from a vehicle provides probable cause for the search of the vehicle; any questions regarding the length of detention or consent to the search are irrelevant).

The facts and circumstances of this case are different from those in United States v. Zavala, 541 F.3d 562 (5th Cir. 2008), where the Fifth Circuit reversed the denial of a motion to suppress involving the search of a cell phone. Based on reasonable suspicion of drug trafficking, the defendant was handcuffed, placed in a patrol car, and detained for about ninety minutes. His cell phone was searched without probable cause or consent. The Court

found that, by searching the defendant's cell phone, the officers exceeded the scope of a lawful protective search. The Court also found that the defendant (and his cell phone) should have been released after the first (consensual) search of his vehicle failed to uncover any drugs. Id. at 580.

In this case, the entire stop lasted about eighty-three minutes. Trooper Bennett had probable cause to search the truck (based on the smell of marijuana) within about seven minutes. Defendant's consent to the search of his truck was obtained about two minutes later. About 30 minutes into the stop and while waiting for the canine to arrive, Defendant re-urged his consent to a thorough search of the truck ("you can tear that motherfucker up"). About 50 minutes into the stop (after the dog failed to alert), one officer stated that he was "pretty sure there's money in there [the truck]." Defendant consented to the search of his cell phones about one hour into the stop. The officers did not learn that the cash from the drug transaction had been found in another vehicle until two or three minutes later. Video 01:09. Thus, while the overall stop was fairly long, the officers acted appropriately during the stop to resolve the initial reasonable suspicion, which quickly developed into probable cause to search the truck. The officers then acted in a reasonable and prompt manner to search the truck.

**Defendant's Cell Phones**

The validity of Defendant's consent to the search of his cell phones must also be evaluated. The Government bears the burden of proving that Defendant's consent was free

and voluntary. United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir. 1993). In determining whether a search based upon consent is valid, the government must prove that the search was voluntary and that the defendant consented to the search or consent was obtained from a third party with the ability to give valid consent. United States v. Jenkins, 46 F.3d 447, 451-452 (5th Cir.1995).

In determining whether a consent to search is voluntary, the Fifth Circuit reviews several factors, no one of which is dispositive. These factors include: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of her right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. Id. An analysis of these factors shows that Defendant's consent to the search was voluntary.

With respect to the first factor, the voluntariness of Defendant's custodial status, it cannot reasonably be said that Defendant believed he was free to leave at the time his consent was obtained. No one ever told Defendant he was free to leave. In fact, until Trooper Bennett issued the warning citations and returned Defendant's driver's license, Defendant was not free to leave.

With regard to the second factor, the presence of coercive police procedures, none of the troopers or agents coerced Defendant into consenting to the search of the cell phones. All of the officers were very professional and cordial to Defendant throughout the encounter.

With regard to the third factor, Defendant remained cooperative and conversational with the officers, and he showed no signs of distress or other unpleasantness.

With regard to the fourth factor, awareness of the right to refuse consent, there is no evidence pointing either way on this issue.

As to the fifth factor, Defendant's education and intelligence, Defendant's conversations with the officers suggests at least an average level of intelligence.

Regarding the final factor, Defendant's belief that no incriminating evidence will be found, Defendant was not aware of the ongoing narcotics investigation. It is very likely that he had no reason to believe that the officers would recognize anything incriminating about the contacts (or numbers) in his cell phones.

Based on all of the circumstances, the undersigned finds that Defendant freely and voluntarily consented to a search of his cell phones.

**Search Incident to Arrest**

The Government proffers an alternative basis to support the search of Defendant's cell phones. According to the Government, there was probable cause (based on the collective knowledge doctrine) to arrest Defendant and, therefore, the officers could search Defendant's cell phones pursuant to a search incident to arrest under United States v. Finley, 477 F.3d 250 (5th Cir. 2007) and United States v. Zavala, 541 F.3d 562 (5th Cir. 2008). The Government argues that the officers had the discretion to release Defendant, rather than arrest him, to allow the investigation to continue. Doc. 68, page 5.

The Government did not provide any authority to the court that confirms that the search incident to arrest theory applies in situations where no arrest is made. In Zavala supra, the Fifth Circuit noted that it is "axiomatic that an incident [to arrest] search may not precede an arrest and serve as part of its justification." 541 F.3d at 575. If the Government had authority for the proposition that a search incident to arrest is permitted *even when there has been no arrest*, the Government should have provided that authority to the undersigned before now. See e.g., United States v. Sanchez, 555 F.3d 910.921 (10th Cir. 2009)("To be sure, it appears that there can be no search incident to arrest unless the suspect is at some point formally placed under arrest."). Because the undersigned finds that Defendant freely and voluntarily consented to the search of his cell phones, the Government's alternative justification will not be researched or explored further.

**Conclusion**

The initial traffic stop was justified, and the troopers and narcotics agents did not unconstitutionally prolong the stop to obtain Defendant's consent to the search of his cell phones. Defendant freely and voluntarily consented to the search of his cell phones.

Accordingly;

**IT IS RECOMMENDED** that Defendant's Motion to Suppress (Doc. 63) be **denied**.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this

Report and Recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 45(b). A party may respond to another party's objections within **seven (7) days** from the filing of the objections. Counsel are directed to furnish a paper courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 4th day of February, 2010.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE